AETNA INDEMNITY CO. *vs.* THE BALTIMORE,
SPARROWS POINT AND CHESAPEAKE
RAILWAY COMPANY.

*Reformation of written instruments: jurisdiction of equity;*
*right of Court to retain control; bond of indemnity unsigned*
*by principal; mistake; correction by order of Court; limi-*
*tations; auxiliary proceedings. Construction con-*
*tracts: bond of indemnity; right of obligor to*
*complete and hasten work.*

A bond of indemnity had been executed by the surety, and
delivered by the principal to the obligees and accepted, exe-
cuted and filed away by them, both parties overlooking the
fact that its execution by the principal had been omitted and
all believing that it had been properly executed, and all par-
ties so intending; there was no evidence of *laches,* beyond the
mere continuance of the original misapprehension of the par-
ties. *Held,* that it was proper for equity to grant relief by
decreeing that the instrument should be reformed.      p. 529

When equity reforms an instrument it can retain control and
enforce it as reformed, administering full relief to the par-
ties.                                                  p. 528

A bond of indemnity provided that any suit at law or pro-
ceeding in equity to recover any claim thereunder against the
surety must be instituted within six months after the com-
pletion of the work specified in the contract. A suit at law
was brought upon the bond within the time specified, but as
auxiliary thereto a bill in equity was filed, after that time,
to have the bond of indemnity reformed; a decree granting
the relief sought was affirmed on appeal, and the cause
remanded for further proceedings, with the suggestion that
the bill be amended so as to allow the Court to retain control
and grant complete relief between the parties. In such fur-
ther proceedings the above provision of the bond was pleaded

as a bar to recovery against the surety. On appeal, it was *held,* that the proceedings were all auxiliary to the original suit, and that under the circumstances the plea of limitations could not be sustained.                                    p. 530

Under such circumstances the plaintiff should not be compelled to elect between his action at law and a proceeding in equity; as the discontinuance of the action at law might give greater force to the defence of limitations.                p. 530

A supplemental agreement between a railroad company and a construction company under contract to construct a road for it provided that if the work did not progress with sufficient rapidity, the engineers of the railroad might intervene and co-operate in the work at the expense of the construction company; the surety on the bond of the construction company had assented to this. The construction company having failed in their contract, the railroad company completed the work and brought suit upon the bond. Among other things, the surety made the defence that the blue prints on which the contract was based were deceptive, and also that the railroad company, intervening to hasten and complete the work, had done so in an unnecessarily expensive manner. *Held,* that the evidence did not sustain either allegation.        pp. 532, 533

Where the conditions upon which a contract was entered into were all open to the full appreciation of the party at the time, and no objection was made by him or his surety upon the contract, they can offer no excuse for relieving the principal or his surety from liability thereunder.        pp. 534, 535

In an action of a railroad company against a surety of a construction company that failed in its contract to construct a road for the railroad company, it was *held,* that the railroad company was entitled to recover the difference between the contract price and the sum actually paid by the railroad company to complete the construction, there having been produced no evidence to show that there was any dereliction on the part of the railroad company in not having the road completed at any lower price.                                    pp. 536, 537

*Decided February 28th, 1912.*

Appeal from the Circuit Court of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., BRISCOE. PEARCE, BURKE, THOMAS, PATTISON, URNER and STOCK-BRIDGE, JJ.

*John G. Deming* (with a brief by *Whitelock, Deming* and *Kemp*), for the appellant.

*George Dobbin Penniman,* for the appellee.

URNER, J., delivered the opinion of the Court.

When this case was considered on a former appeal (112 Md. 389) the question for decision was presented upon bill and answer, and as some of the material allegations upon which relief was prayed were either denied or not admitted, the decree below granting the prayer of the bill was reversed and the cause was remanded for further proceedings. At that time the sole object of the suit was to secure the reformation of the bond executed by the Aetna Indemnity Company as surety, and intended to be also executed by the Constructing Engineers' Company as principal, conditioned for the due performance by the latter company of its contract with the Baltimore, Sparrows' Point and Chesapeake Railway Company for the building of an electric railway. This relief was sought in order that an action pending at law on the bond might be successfully prosecuted. It was alleged in the bill that the bond for which the contract provided was delivered by the Constructing Company to the Railway Company and by it accepted; that the bond had been executed by the Aetna Company as surety, but by inadvertence had not been executed by the Constructing Company as principal; that the construction work was begun and partially performed, but the railway company, finding that it would not be completed according to the terms of the contract, entered into a supplemental agreement with the constructing

company for the co-operation of the two companies in the
further progress of the work; that the Aetna Company con-
sented in writing to this arrangement, with the stipulation
that its liability in any event should be limited to the pay-
ment of $10,000, as prescribed by the bond; that a receiver
was shortly afterwards appointed for the constructing com-
pany, but as he was not authorized to proceed with the work,
the railway company was compelled to employ other con-
tractors for its completion; that the cost of having the road
finished was largely increased over the amount the construct-
ing company was to have received because of the fact that
the unfinished work had to be done during the winter, and
as a result the railway company sustained a loss for which
a suit at law had been brought on the bond; that after the
bringing of that suit and within two weeks before the filing
of the bill in this case, it was discovered that the bond was
not executed by the constructing company, this omission not
having been noticed at the time of its delivery, and the bond
having since been kept among the records of the railway
company under the belief by its officers that it had been duly
executed both by the principal and the surety.

The constructing company and its receiver filed answers
admitting that it was the intention of the company to deliver
a good and sufficient bond, and its president and secretary
stated their understanding that they had in fact executed
the instrument for the company before it was delivered. The
Aetna Company, however, answered separately alleging that
the execution of the bond by the constructing company was a
condition precedent to liability on the part of the surety;
and that the railway company had been guilty of laches. It
averred that it had consented to the supplemental agreement
referred to in the bill in the mistaken belief that the bond
had been duly executed. It charged that the railway com-
pany as custodian of the bond knew or ought to have known
that it had not been executed, but failed to disclose the
fact until long after the alleged liability had occurred and
the action at law had been instituted. The answer denied

that the railway company was compelled to pay for the completion of the work the sum mentioned in the bill in excess of the amount contracted to be paid to the constructing company, or that there was any reason for the work to cost more than the amount which that company was to have received; and it alleged that the railway company owed the constructing company a large sum of money. One of the averments of the bill which the answer neither admitted nor denied was that the plaintiff in good faith accepted the instrument as the properly executed bond of the constructing company, with the Aetna Company as surety, given in performance of the agreement to that effect, that it was received without such scrutiny as to disclose the fact that the constructing company had not executed it, and that being regarded as a good and binding obligation on the part of both companies, it was placed among the records of the railway company for safe keeping.

In this condition of the pleadings, and in the absence of evidence to sustain the material allegations of the bill as to which the answer did not waive the necessity of proof, it was held that a decree of reformation could not properly be passed, but that the cause should be remanded in order that a replication might be filed and testimony taken to establish the essential facts. It was said, however, by CHIEF JUDGE BOYD in the opinion disposing of the case as then presented that "If a surety executes such a bond, and gives it to the principal to be executed by him, and then to deliver it to the obligee, and the principal does so deliver it, having simply overlooked the fact that he had not executed it, and the obligee, believing it was properly executed, and not observing that it had not been by the principal, placed it away for safe keeping with its papers, all three parties believing it had been regularly executed and intending that it should be, it would be a confession of a very limited power to do justice, if a Court of equity would have to admit that it could not require the bond to be put in the shape it was intended and believed to be by all the parties, merely because one of them

was a surety. But we do not understand the powers of a
Court of equity to be so restricted." The opinion suggested
that upon the remanding of the proceedings it might "be
better to amend the bill, so far as necessary to have the
whole matter disposed of in the equity case, if the Court con-
cludes that the plaintiff is entitled to have the bond cor-
rected;" and the principle was stated that "When a Court of
equity reforms an instrument, it can retain control and
enforce it as reformed, administering full relief."

The present appeal is from a decree passed upon pleadings
amended in consequence of the suggestion of this Court and
upon evidence directed to the issues of fact thus raised. The
relief prayed by the pending bill, and granted by the decree
now under review, involves both the reformation of the bond
and the payment of the sum it prescribes on account of the
loss claimed and found to have been sustained by the rail-
way company as the result of the constructing company's
discontinuance of the work. We have now to determine
upon the evidence whether the appellee is entitled to have
the bond reformed and to enforce against it the liability
asserted in the bill. There are also questions arising upon
a plea of contractual limitations filed by the Aetna Com-
pany, and upon its petition that the complainant be required
to elect between its suits at law and in equity. The con-
structing company and its receiver did not dispute the right
of the railway company to have the bond corrected. Their
defence was based upon the ground that the railway com-
pany's conduct was responsible for the failure of the con-
structing company to complete the work according to the
contract. They have not appealed, however, from the decree
overruling this contention, and the questions before us are
to be decided from the standpoint of the Aetna Company
as the sole appellant.

In our judgment the evidence in the present record fully
sustains the allegations of the bill and gratifies the rule
announced upon the former appeal with respect to the cir-
cumstances upon which the right of reformation was pred-
icated. It is made perfectly clear by the testimony that the

bond was executed by the Aetna Company and given by it
to the constructing company to be by it executed and then
delivered to the obligee, that it was delivered by the princi-
pal to the railway company as the bond required by the con-
tract between them, both overlooking the fact that its execu-
tion by the principal had been omitted and both believing
that it had been properly executed by each of the obligors,
and that in this belief the railway company filed the bond
away for safe keeping and remained in ignorance of the
defect in its execution until shortly before the institution of
this suit.   There can be no possible doubt that all the par-
ties to the bond intended and understood it to be a perfected
obligation when it reached the hands of the railway com-
pany, and that upon the faith of this indemnity the contract
of the principal for the construction of the obligee's railway
was allowed to become effective.   These are the precise con-
ditions which this Court described in the prior appeal as
presenting an appropriate case for the reformation of a bond
even as against a surety, and as there is no evidence of laches
to which the appellant points beyond the mere continuance
of the original misapprehension of the parties, and as the
surety does not appear to have been prejudiced in any way
by the fact that the error was not sooner discovered, we
must concur in the action of the learned Court below in
decreeing that the instrument should be reformed.

There is a provision in the bond that any suit at law or
proceedings in equity to recover any claim against the surety
must be instituted within six months after the completion
of the work specified in the contract.   The suit at law on
the bond was brought within the period prescribed, but the
original bill in equity was not filed until three years later.
In its answer to the present bill the Aetna Company pleads
the provisions just mentioned as a bar to recovery against
it as surety.   The theory of this plea is that since the bill
is now directed to the enforcement of the bond as well as to
its reformation, the limitation in question is available as a
defence.

530   AETNA I. CO. vs. BALT., S. P. & C. R. R.

Opinion of the Court.                    [117

The primary purpose of the bill was exclusively for the reformation of the bond, and as against such relief it is conceded that the contractual limitation could not be pleaded. If the appellees had followed the procedure originally contemplated, the bill would have retained its character as an auxiliary remedy.   In that event the liability of the surety would doubtless have been enforced in the action at law after the bond had been reformed in equity.   If this course had been pursued, the question now being considered could not have arisen, and if we were to reverse the decree and dismiss the bill so far as *recovery* against the surety is concerned, the suit at law could still be prosecuted to judgment.   The bill was amended in conformity with a suggestion of this Court which was made with a view to the convenient and economical administration of justice between the parties, and was based upon the well established principle stated in the former opinion.   It is obvious that the whole purpose of the provision upon which the appellant relies was to protect the surety against prejudicial delay in the assertion of its liability on the bond.   As this purpose has been fully accomplished by the institution of the suit at law within the specified period, and as the proceeding now before us is predicated upon that prior and pending action, we can have no hesitation in deciding, under the circumstances of this case, that the plea of limitations should not be sustained.

The petition of the surety to require the complainant to elect between its suits at law and in equity was refused by the Court below, but an order was passed restraining the prosecution of the former during the pendency of the latter action.   In reference to this application we think it sufficient to observe that the conditions which would make such a course appropriate are not here present.   The legal action could not be maintained without a reformation of the bond, and this could be secured only in the equity proceedings.   To require an election, therefore, would be to simply force a dismissal of the suit at law.   The effect of this might be to enable the surety to urge with greater force the defence of limitations upon which it seeks to rely.   If the bill had not been

amended, it would not be proposed that an election or dismissal should be required, and we are certainly not justified in compelling such action merely because the scope of the bill has been enlarged, at the suggestion of this Court, to admit of a complete adjudication of the rights and liabilities of the parties in one proceeding.

The principle defence in the case is founded upon the contention that the conduct of the railway company, both before the contract was awarded and during the prosecution of the work, brought about the failure of the constructing company to fully perform its undertaking.  In order that this defence may be understood it will be necessary to state briefly the facts relating to the inception of the contract and its partial performance and eventual abandonment.  When the constructing company and others were invited to make proposals for the building of the road they were furnished by the railway company with blue prints containing what was known as the "graduation profile."  This showed by sections the grade line of the road bed and the surface line of the ground over which it was to be constructed.  At the points on the plan where the line of the natural surface extended above or below the line of the proposed grade there were figures indicating in cubic yards the contents of the corresponding excavations and embankments.  The contractor was to be paid a stipulated price per yard for excavation, and this compensation was to cover the work of removing to the fill the material necessary to bring the surface up to grade.  The specifications provided that the bids should be made upon the basis of an "unlimited haul," which was intended and understood to mean that the price proposed for excavation was to include the hauling of the earth needed in the embankments regardless of the distance it would have to be moved.  If the cuts proved to be insufficient to furnish the required material for the fills, the deficiency was to be supplied from "borrow pits."

In submitting a bid for a contract of this character it is evident that a contractor would regard as an important factor in his estimate the quantity of material required for the

construction of the embankment. It is with reference to this feature of the work that the constructing company is alleged to have been misled. The blue print indicated a number of marshes along the course of the proposed railway. At such places, as at all others where fills were shown, the stated number of cubic yards represented only the theoretical contents of the embankments between the surface and grade levels, with no allowance for settlement on account of the yielding quality of the ground. The officers of the constructing company, however, prepared their bid upon the theory that the figures on the profile showed in all instances the entire quantities of earth to be placed in the fills. They assumed that the engineer of the railway company had taken into consideration the subsidence of material in the marshes and that the results given on the blue print included an estimate of the additional deposits required to meet such contingencies. It is clear from the evidence that the railway company did not intend the profile to be so interpreted, and that it made no representations to the constructing company to influence it in the adoption of the theory upon which its bid was submitted. The testimony of the engineers who prepared the plan, and of other experts, was to the fact that it was impracticable to calculate with any degree of accuracy the extent of the settlement to be anticipated when an embankment is built on a marsh; that because of this difficulty the customary practice in such cases is to simply state on the blue print the number of cubic yards contained in the fill between the natural surface and the proposed grade; and that the contractor is expected to make what he may consider a safe allowance for subsidence, based upon his experience and a careful inspection of the conditions with which he will have to deal. This view is supported by the unquestionable weight of the evidence, and we are convinced that the honest misapprehension of the constructing company, in which the other contractors who made proposals do not appear to have shared, as to the proper basis for estimating the fills,

was not induced by any want of good faith on the part of the railway company.

Apart from this consideration, however, we are unable to find in the evidence any sufficient basis upon which to sustain the contention that the discontinuance of the work by the constructing company was occasioned by the misconception to which we have just referred. On the contrary, the testimony of the officers of that company attributed the abandonment of the contract to an altogether different cause. In answer to the specific question as to why the company did not complete the contract, its president and chief engineer both testified that it was because the railway company retained a monthly payment upon which the contractor was dependent for the further prosecution of the work. This was shown to have been done because of the fact that the cost of an auxiliary force employed by the railway company, to insure the completion of the road within the specified time, exceeded the amount to which the constructing company would have been entitled for its own larger volume of work during the period of the co-operation. The contract permitted the intervention of the railway company for the purpose stated if in the opinion of its engineer the work at any time did not show such progress as to make it probable that the railway would be finished by the appointed time. It was to meet such an emergency that the co-operative force was employed. The parties entered into a supplemental agreement expressly defining the terms upon which the railway company should assist in the work, and providing that the cost should be deducted from the amount earned by the constructing company under the original contract, which was continued in effect. The appellant as surety on the contractors bond consented in writing to this arrangement. The work was conducted on this basis for about a month, at the end of which time the account between the parties showed that the cost of the railway company's co-operation overbalanced the amount due the constructing company under the

contract, and as the latter company was not financially able to sustain the loss of the monthly payment thus absorbed, its affairs were placed in the hands of a receiver, and the further performance of the contract on its behalf was abandoned.

The proof does not show that the delay in the work which occasioned the intervention of the railway company resulted from the constructing company's misinterpretation of the embankment figures on the profile, or that but for this error the contract would have been fully performed. While the actual quantities of material required for the fills in the marshes greatly exceeded those indicated by the theoretical yardage on the blue print, there is nothing in the record to enable us to determine how far the constructing company's operations were affected by such conditions. Not more than half of the graduation was finished when the company left the work, and we have no means of ascertaining to what extent the construction it accomplished involved a larger expenditure of time and money than it had anticipated. It does not appear that any objection was raised by the company, while it was engaged in building the road, on account of the existence of the unexpected conditions which are now the subject of complaint, and we are unable to find as a fact that this consideration materially influenced the abandonment of the contract.

It is insisted, however, that the railway company did not fairly exercise its right of intervention. The point is made that the unsatisfactory progress of the work was due to unfavorable weather conditions, to the increase in the movement of material for the fills, and to the fact that the construction was retarded as the result of arbitrary directions given by the railway company's engineers; and it is asserted that, under such circumstances, it was unreasonable and inequitable for the company to avail itself of the provision of the contract entitling it to co-operate in the work at the expense of the contractor. The difficulty with this contention is that the conditions to which it refers were all open

to the full appreciation of the constructing company at the time it agreed to the employment of the auxiliary force, and no objection appears to have been then made upon the grounds now urged. In the supplemental agreement the co-operation for which it provided is referred to as being necessary to insure the early completion of the road. In view of the position thus assumed by the constructing company with complete knowledge of the history of the undertaking, and without any demand for an extension of time on account of the causes of delay here specified, we would not feel justified in holding that the circumstances under which the railway company intervened were such as to relieve the surety on the contractor's bond from liability.

The remaining question to be considered relates to the amount of loss to the railway company for which the Court below decreed recovery. After the discontinuance of the work by the constructing company, and the declination of the appellant as surety to assume the contract under a provision in the bond conferring that right, the railway company invited new bids for the completion of the road according to the original plans and specifications. As the further operations had to be conducted during a season of the year when the weather conditions would be much more unfavorable than those with reference to which the former contract was made, and as the less expensive portions of the grading had already been done, the prices required to be paid the substituted contractor were considerably higher than those obtained in the first instance. At the conclusion of the entire work the estimate of its cost to the railway company showed an excess of $29,588.95 over the amount for which the road would have been built if the constructing company had completed its contract. The decree below ascertained this to be the loss which the railway company had sustained by reason of the default of the constructing company, and adjudged that of this amount the appellant should be liable to pay the sum of $10,000, as stipulated in the bond, with interest

from June 23rd, 1906, the date of the institution of the suit at law.  There being no appeal by the constructing company or its receiver, we are confined to the inquiry whether there has been any error in the ascertainment of the loss by which the surety has been prejudiced.

The contract in connection with which the bond was given provided for the grading of the roadbed at the rate of 22¼ cents per cubic yard of excavation, for the track laying at $1.15 per foot for single and $2.28 for double track, for overhead equipment at 27 6/10 cents per foot for single, and 35 7/10 cents for double tracks, and for drainage pipe to be laid at prices ranging from 45 cents to $1.23 per foot, according to sizes specified.  At these figures the railway would have cost in the aggregate $72,144.50.  The contract under which the work was completed required the payment of 57 cents per cubic yard for excavation, $1.41 and $2.80 per foot for single and double tracks, respectively, 37 cents and 45 cents per foot for the corresponding overhead equipment, and from 60 cents to $1.43 per foot for the laying of drainage pipes.  Upon the basis of these prices the work done by the new contractor involved an expenditure of $91,747.85, and as the constructing company's settlement amounted to $9,985.60, the cost of the construction as a whole was shown to be $101,733.45.  The loss ascertained by the decree was the difference between the amount last stated and that which would have been paid under the contract with the constructing company.

The evidence is that the railway company was especially interested in the early completion of the road in order that it might be ready for use during the ensuing season in connection with an excursion resort which the company was establishing on the Bay Shore, and it further appears that reasonable efforts were made to secure competition in the bidding for the work which the constructing company left unfinished.  The principal increase of cost was in the work of graduation, and as to this the constructing company concedes that its bid was made very low with a view to securing

the contract and with the exception that a profit would be realized from other portions of the construction. We find no evidence in the record showing affirmatively that the work could have been continued, under the conditions presented, at lower prices than those actually obtained. There is certainly nothing to prove that a reasonable increase in the expense, under such conditions, should have been less than the amount of the bond; and this is the only question with which we are now concerned. The appellant was repeatedly reminded of its right as surety on the contractor's bond to undertake the further conduct of the work, but as it was content to leave the matter in the hands of the railway company, we would not be warranted, in the absence of any proof of dereliction on the part of that company, to hold that the liability of the surety is discharged or affected on account of the additional cost shown to have been actually incurred.

The exceptions to evidence, filed and overruled in the Court below, related to the time of the production, rather than to the general admissibility of the proof to which they refer, and are not, in our opinion, of sufficient importance, even if held correct in theory to justify a reversal in view of the testimony in the case to which there is no objection.

The record before us is voluminous and we have not found it expedient to discuss in much detail the testimony it contains, but upon a careful consideration of all the facts of the case we have not been able to discover any prejudice to the rights of the appellant in the decree under review, and it will accordingly be affirmed.

*Decree affirmed, with costs.*